Affirmed by published opinion. Judge WILLIAMS wrote the majority opinion, in which Chief Judge WILKINSON and Judges WIDENER, WILKINS, NIEMEYER, and LUTTIG joined. Judge HAMILTON wrote an opinion concurring in the judgment. Judge MICHAEL wrote a dissenting opinion, in which Judges K.K. HALL, MURNAGHAN, ERVIN, and DIANA GRIBBON MOTZ joined.
OPINION
WILLIAMS, Circuit Judge:
We granted en banc review of this case to consider the appeal of William Runnebaum, an asymptomatic individual infected with the human immunodeficiency virus (HIV), from a district court order granting summary judgment for NationsBank of Maryland on Run-nebaum’s claims of discrimination under the Americans with Disabilities Act (ADA), see 42 U.S.C.A. §§ 12101-12213 (West 1995 & Supp.1997); and the Employee Retirement Income Security Act (ERISA), see 29 U.S.C.A. §§ 1001-1461 (West 1985 & Supp. 1997). A divided panel of our court reversed the district court’s grant of summary judgment, holding that Runnebaum established a prima facie case of discrimination and forecast enough evidence to create “a genuine issue of material fact as to whether he was fired because he was regarded as having a disability.” Runnebaum v. NationsBank of Maryland, 95 F.3d 1285, 1297 (4th Cir.1996). For the reasons that follow, we hold that Runnebaum did not establish a prima facie case of discrimination based on disability. Accordingly, we affirm the district court’s grant of summary judgment for Nations-Bank.[1]
j FACTS
Runnebaum was hired by NationsBank in May 1991. During the first year of his employment, he worked in the bank’s private banking department as a marketing coordinator. While working in the private banking-department, Runnebaum experienced difficulty in satisfying his professional responsibilities. His supervisor, Michael Kines, detailed Runnebaum’s improper professional and personal conduct in written evaluations dated March 20, 1992, and May 18, 1992. Michael Brown, NationsBank’s Senior Managing Officer in Baltimore, and David Kutch, another of Runnebaum’s supervisors, also testified that Runnebaum’s professional career was plagued by unexplained absenteeism, chronic tardiness, and lengthy lunch periods.
In May 1992, Runnebaum applied for a sales position in NationsBank’s new Baltimore trust department. Ann Pettit, the bank’s trust department supervisor, hired Runnebaum in June 1992. In completing the paperwork to effectuate the transfer, Run-nebaum unequivocally represented that he was not handicapped. Runnebaum’s transfer to the new department was effective July 8, 1992. Not surprisingly, Kines and Kutch were relieved to see Runnebaum transferred out of the private banking division.
At the time Runnebaum was transferred to the trust department in Baltimore, Pettit articulated NationsBank’s expectations for him in a memorandum dated July 14, 1992 (July Memorandum). The memorandum stated that Runnebaum should arrange with NationsBank sales officers to make “18 joint prospect calls” and “12 joint external referral source calls.” Runnebaum does not dispute that he failed to comply with the July Memorandum.
*162 In addition to failing in his professional duties, Runnebaum continued to engage in inappropriate behavior. In presentations to two law firms whose business NationsBank was courting, Runnebaum presented trust and estate information in a condescending manner to attorneys who were skilled in that area of the law. Additionally, Runnebaum provided to one law firm a trust and estate manual prepared by another law firm. In doing so, he implied that the recipient of the manual would not otherwise comprehend trust and estate law. At yet another meeting with a major client, NationsBank officers were “committed that [Runnebaum] not be there, because they were afraid of what he might say or do.” (J.A. at 549.) Brown cautioned Runnebaum regarding his unprofessional conduct. In addition, Pettit felt that Runnebaum’s joking was “inappropriate.” In fact, Runnebaum admitted in his own sworn testimony that Pettit counseled him twice concerning his unprofessional conduct at meetings.
A homosexual, Runnebaum was diagnosed with HTV in 1988. At all times relevant to this case, he has been asymptomatic. In September 1992, Runnebaum told Brown, also a homosexual, that he was infected with HIV. He revealed that he was HIV-positive to Brown at a gay bar in their capacity as friends. Brown testified:
Again, I think that it was like a weekend night or something, and [Runnebaum] was down around the harbor with friends or something, and called me and said, come on down and join us or something like that_ I ended up coming down, picking [Runnebaum] up standing on the street.... [W]e went to a bar, it is on Charles Street, called — I forget the name. It was a restaurant bar, gay clientele. And my recollection is he just told me.
William was sharing with me something that was you know, deep, very personal, known by very few.... In fact, his lover, John, didn’t even know [he was HIV-positive], he told me. And I can remember just thinking — I remember being in a state of panic, panic because I was thinking how am I going to work, you know and be a friend to somebody who is HIV[-]positive.... But, you know, suppose he dies on me. Should I tell [Pettit] at this point, should I tell [NationsBank]? I remember feeling panicky, uncontrolled.
But at the same time[,] I remember thinking I cannot let him think that it bothers me a bit. I felt like that I was there to protect him.
(J.A. at 506-08.) Runnebaum asked Brown if the bank’s employee health plan would pay for AIDS medication.
On November 3, 1992, Pettit met with Runnebaum to discuss his untoward conduct and his dereliction in meeting sales goals. According to Runnebaum, Pettit “counseled me ... on my behavior in [staff] meetings,” stated “that there was a lot of jocular behavior going on” in the meetings, and “asked me not to participate in it.” (J.A. at 91.) According to Pettit, she decided at the meeting that Runnebaum would not be able to complete his assigned activities and should be discharged.
Sometime in November 1992, Runnebaum placed his first order for the prescription drug azidothymidine (AZT), which was paid for by the bank’s health plan. AZT is a drug used in the treatment of HIV infection and AIDS. Because Runnebaum could not wait at home to receive shipments of the drug, he had them delivered to the bank. Packages containing AZT (addressed to Runnebaum) were twice inadvertently opened by bank personnel.
Despite her decision to terminate Runneb-aum, Pettit decided to give him an opportunity to redeem himself. Accordingly, on November 6, 1992, she gave Runnebaum responsibility for planning and hosting the bank’s “Greater Baltimore Holiday Reception,” scheduled for December 15th. She also reduced his load of calls on “prospects” (potential clients) and “external referral sources.” On December 15, 1992, Runneb-aum hosted the bank’s holiday reception. He brought his gay lover to the reception and introduced him to Pettit and others as his “boyfriend.”
Runnebaum’s inability to meet reduced sales goals and his frequent failure to con *163 duct himself professionally confirmed Pettit’s decision to discharge him. In a memorandum dated January 7, 1993 (January Memorandum), Pettit observed that Runnebaum failed to comply with the July Memorandum and to comport himself professionally. While many considerations entered the calculus to discharge Runnebaum,[2] Pettit focused on the fact that he had failed to meet his sales goals, despite the fact that his goals had been reduced in the hope that he might be able to satisfy them, as well as failed to perform required duties and exhibit proper decorum.
On January 12, 1993, Pettit summoned Runnebaum to a meeting with Phillip Caw-ley, NationsBank’s personnel manager for the Baltimore/Washington area. At the meeting, Pettit fired Runnebaum. According to Pettit, she fired Runnebaum for failing to complete the assignments listed in the July Memorandum and for failing to present a professional image. Pettit stated in her deposition that she had already decided to fire Runnebaum when she learned in late November or early December that he was infected with HIV. She testified that Runnebaum’s condition played no role in her termination decision. Runnebaum said that his firing “came as a total surprise. I had no verbal warnings, no written warnings. I was called in and let go and told I would be paid through the end of the month and it totally blindsided me.” (J.A. at 237.)
Runnebaum promptly filed an administrative claim with the Equal Employment Opportunity Commission and received a right-to-sue letter. He then filed suit against Na-tionsBank in the United States District Court for the District of Maryland, bringing two claims. First, he claimed that Nations-Bank terminated him in violation of the ADA because he is HIV-positive, a condition that he contends renders him disabled.[3] Second, he claimed that his termination violated ERISA by preventing him from receiving payments for his AZT treatment. After discovery, NationsBank moved for summary judgment. On August 17, 1994, the district court, applying the McDonnell Douglas analytical framework, granted the bank’s motion on the ground that Runnebaum failed to establish a prima facie case of discrimination under the ADA. Alternatively, the court held that Runnebaum failed to present evidence, sufficient to create a triable issue, that the legitimate, nondiseriminatory reason that NationsBank proffered to explain Runneb-aum’s discharge was a pretext for discrimination. The court also granted summary judgment for NationsBank on Runnebaum’s ERISA claim, stating that it decided the ERISA issue “under the same analytical framework as [the] ADA claim.” (J.A. at 572.) Runnebaum now appeals.
II. THE ADA CLAIM
We review a district court’s grant of summary judgment de novo. See Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir.1988). Summary judgment is proper only if no material facts are in dispute. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The compulsory language of Federal Rule of Civil Procedure 56(c) “mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.” Celotex, 477 U.S. at 322, 106 S.Ct. at 2552. Following NationsBank’s motion for summary judgment, Runnebaum bore the burden of producing competent evidence on each element of his claim. See id. at 324, 106 S.Ct. at 2553. The district court, in granting NationsBank’s motion for summary judgment, determined that Runnebaum failed to present evidence sufficient to create a genuine issue with respect to any material fact, and *164 that NationsBank was entitled to judgment as a matter of law.
In determining whether a genuine issue of material fact is in dispute, “[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Runnebaum, however, “cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.” Beale v. Hardy, 769 F.2d 213, 214 (4th Cir.1985) (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir.1984)). Indeed, “[t]he mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.” Anderson, 477 U.S. at 252, 106 S.Ct. at 2512. Thus, “[m]ere unsupported speculation ... is not enough to defeat a summary judgment motion.” Ennis v. National Ass’n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir.1995).
A. McDonnell Douglas Framework
The McDonnell Douglas scheme of proof applies to ADA claims like Runnebaum’s, “where the defendant disavows any reliance on discriminatory reasons for its adverse employment action.” Ennis, 53 F.3d at 57-58; see generally St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Texas Dep’t of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The McDonnell Douglas proof scheme involves a three-step process. First, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. By establishing a, prima facie case, the plaintiff creates a rebuttable “presumption that the employer unlawfully discriminated against” him, and the burden of producing evidence on the issue shifts to the employer. Burdine, 450 U.S. at 254, 101 S.Ct. at 1094. The employer then must “rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated] ... for a legitimate, nondiscriminatory reason.” Id. at 254, 101 S.Ct. at 1094. The employer “ ‘must clearly set forth, through the introduction of admissible evidence,’ reasons for its action which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.” St. Mary’s Honor Ctr., 509 U.S. at 507, 113 S.Ct. at 2747 (quoting Burdine, 450 U.S. at 254-55 & n. 8, 101 S.Ct. at 1094-95 & n. 8). Finally, if the employer meets its burden of production, the presumption raised by the prima facie case is rebutted and “drops from the case,” Burdine, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10, and the plaintiff bears the ultimate burden of proving that he has been the victim of intentional discrimination, see St. Mary’s Honor Ctr., 509 U.S. at 506-11, 113 S.Ct. at 2746-49 (holding that a prima facie case plus disbelief of employer’s asserted justification for employment action is not necessarily sufficient to establish a violation and that, in such cases, summary judgment is appropriate unless the plaintiff presents adequate evidence that the employer unlawfully discriminated).
B. The Prima Facie Case
To establish a prima facie case of discrimination in a discharge case under the ADA, a plaintiff must prove by a preponderance of the evidence that (1) he was a member of the protected class; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer’s legitimate expectations; and. (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. See Ennis, 53 F.3d at 58. Evidence that a plaintiff presents in attempting to establish a prima facie case “must be such that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law.” Id. at 59 (citing Burdine, 450 U.S. at 254, 101 S.Ct. at 1094). It is undisputed that NationsBank discharged Runnebaum. We therefore consider whether Runnebaum established the remaining three elements of a prima facie case of discrimination.
*165 1. Member of the Protected Class
The first element that Runnebaum must satisfy in establishing a prima facie case is that he was a member of the protected class. Runnebaum claims that he is protected by the ADA as “a qualified individual with a disability,” 42 U.S.C.A. § 12112(a) (West 1995), because he is HIV-positive. NationsBank contends that Runnebaum, who was asymptomatic at all times relevant to this case, failed to establish that asymptomatic HIV infection is a disability under the statute.[4] The Equal Employment Opportuni *166 ty Commission (EEOC) and the Whitman-Walker Clinic, Inc., appearing as amicus curiae, contend that asymptomatic HIV infection is a disability per se under the statute.
The ADA describes three subsets of disability, any one of which is sufficient to trigger the statute’s protections. The ADA states:
The term “disability” means, with respect to an individual—
(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.
42 U.S.C.A. § 12102(2) (West 1995). In En-nis, 53 F.3d at 55, we stated that “[t]he term ‘disability’ is specifically defined, for each of subparts (A), (B), and (C), ‘with respect to[the] individual,’ ” 53 F.3d at 59 (second alteration in original), and held that the statute’s “individualized focus” contemplates a case-by-case determination of whether a given impairment substantially limits one or more of the major life activities of the individual, see id. We reaffirm our holding in Ennis; accordingly, a finding that Runneb-aum has a disability under this provision must be made on an individualized basis.[5] See id. at 59-60 (collecting cases holding that a finding of disability must be made on a case-by-ease basis); see also Homeyer v. Stanley Tulchin Assocs., Inc., 91 F.3d 959, 962 (7th Cir.1996) (holding that “a determination of disability must be made on an individualized, case-by-case basis”); Katz v. City Metal Co., 87 F.3d 26, 32 (1st Cir.1996) (same). Neither Runnebaum nor Amici claim that Runneb-aum was fired based on a record of disability, see 42 U.S.C.A. § 12102(2)(B), so we focus on the first and third statutory definitions.
The dissent complains at length — despite our careful adherence to the statutory language and the particular facts of this case— that our holding today effects an amendment § 12102(2) of the ADA. See post at 186. The dissent, however, is hard pressed to find fault with our interpretation of the statutory language. With respect to our analysis of the first statutory definition, the “actual disability” prong of the statute, the dissent “accepts] the dictionary definitions of ‘impair’ and ‘impairment’ adopted by the majority,” post at 180; admits that “[t]he question of whether procreation and intimate sexual relations are ‘major life activities’ under the ADA is ... ‘not free from doubt,’ ” post at 184 (quoting Abbott v. Bragdon, 107 F.3d 934, 939 (1st Cir.1997)); acknowledges that the administrative regulations it relies on are “less decisive,” post at 184; and concedes that our holding that asymptomatic HIV itself does not substantially limit procreation or intimate sexual relations has “intuitive plausibility,” post at 184. With respect to our analysis of the second statutory definition, the “perceived disability” prong, the dissent correctly recognizes that “[t]here is not a great deal of direct evidence that the bank regarded Runnebaum as disabled,” post at 186; and confesses, as it must, that “ ‘the mere fact that an employer is aware of an employee’s impairment is insufficient to dem *167 onstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action,’ ” post at 188 (quoting Kelly v. Drexel Univ., 94 F.3d 102, 109 (3rd Cir.1996)). After making these numerous and important concessions regarding our interpretive analysis, the dissent is left to discuss isolated passages in the legislative history and obscure references in the administrative regulations as support of its position that asymptomatic HIV infection is an impairment that substantially limits one of the major life activities contemplated by the ADA. As we discuss below, neither the legislative history nor the administrative regulations persuade us that Runnebaum’s HIV infection constitutes a statutory disability.
The dissent also complains that we employ “a dizzying flurry of alternate holdings” in concluding that Runnebaum’s asymptomatic HIV infection does not constitute a statutory disability. See post at 186. We certainly do. Runnebaum’s inability to prevail on many grounds (indeed on any ground), however, in no way “betray[s] an uncertainty” on our part as the dissent suggests, see post at 186, but instead only reinforces our conclusion that Runnebaum’s HIV infection is not an impairment that substantially limits one of the major life activities. Finally, the dissent states: “I believe the majority means to create a per se rule excluding those with asymptomatic HIV from the protections of the ADA.” Post at 176; see also post at 186 (“The majority’s opinion must be taken for what it is: a per se rule that excludes those with asymptomatic HIV from the protections of the ADA.”). The dissent would, perhaps, have us hold that asymptomatic HIV infection is per se not a disability under the statute. As we discuss below, however, we decline to go so far.
a. Section 12102(2)(A) — Actual Disability
Subsection (A) defines “disability” to be “a physical or mental impairment that substantially limits one or more of the major life activities” of the individual in question. Because the impairment must impose a “substantial limitation” on “one or more of the major life activities,” the impairment must be significant, not merely trivial. See Byrne v. Board of Educ., 979 F.2d 560, 564 (7th Cir.1992); see also Forrisi v. Bowen, 794 F.2d 931, 933-34 (4th Cir.1986) (concluding in Rehabilitation Act case that “[t]he statutory language, requiring a substantial limitation of a major life activity, emphasizes that the impairment must be a significant one”). To qualify as having a disability under subsection (A), Runnebaum must prove two things: first, that asymptomatic HIV infection is a “physical or mental impairment”; and second, that asymptomatic HIV infection, if an impairment, “substantially limits one or more of the major life activities” of Runnebaum. See Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2nd Cir.1994); see also Abbott, 107 F.3d at 939; Andrews v. Ohio, 104 F.3d 803, 808 (6th Cir.1997).
i. Impairment
First, Runnebaum must prove that asymptomatic HIV infection is a “physical or mental impairment.” 42 U.S.C.A. § 12102(2)(A). The Supreme Court has yet to decide this issue. See School Bd. of Nassau County v. Arline, 480 U.S. 273, 282 n. 7, 107 S.Ct. 1123, 1128 n. 7, 94 L.Ed.2d 307 (1987) (declining to decide in Rehabilitation Act case whether an asymptomatic HIV-infected person “could be considered to have a physical impairment”). Whether asymptomatic HIV infection is an impairment under the ADA is first and foremost a question of statutory interpretation. “When confronted with a question of statutory interpretation, our inquiry begins with an examination of the language used in the statute.” Faircloth v. Lundy Packing Co., 91 F.3d 648, 653 (4th Cir.1996), cert. denied, — U.S. -, 117 S.Ct. 738, 136 L.Ed.2d 677 (1997). In cases where “the statutory language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and ... the sole function of the courts is to enforce [the statute] according to its terms.” United States v. Murphy, 35 F.3d 143, 145 (4th Cir.1994) (quotations omitted). In addition, “[w]hen a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.” Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993).
*168 Here, the term “impairment” is not defined in the statute. Webster’s defines “impair” as to “make worse by or as if by diminishing in some material respect.” Webster’s Ninth New Collegiate Dictionary 603 (1986); see also Black’s Law Dictionary 677 (5th ed. 1981) (“To weaken, to make worse, to lessen in power, diminish, or relax, or othei*wise affect in an injurious manner.”). “Impairment” is defined as a “decrease in strength, value, amount, or quality.” Webster’s II New Riverside University Dictionary 612 (1988); see also Webster’s Third New International Dictionary 1131 (1986) (defining impairment as “deterioration” or “lessening”). Under these definitions, asymptomatic HIV infection is simply not an impairment: without symptoms, there are no diminishing effects on the individual. “[T]he term ‘impairment,’ as it is used in the Act, cannot be divorced from its dictionary and common sense connotation of a diminution in quality, value, excellence or strength.” de la Torres v. Bolger, 781 F.2d 1134, 1138 (5th Cir.1986) (quotation omitted). Many conditions, including HIV infection, are asymptomatic in their initial stages and remain so for an extended period of time. See Chalk v. United States Dist. Court, 840 F.2d 701, 706 (9th Cir.1988) (“Individuals who become infected with HIV may remain without symptoms for an extended period of time.”); Cain v. Hyatt, 734 F.Supp. 671, 679 (E.D.Pa.1990) (“There is a time lapse, often of several years, between exposure to HIV and the onset of symptoms.”). Extending the coverage of the ADA to asymptomatic conditions like Runnebaum’s, where no diminishing effects are exhibited, would run counter to Congress’s intention as expressed in the plain statutory language.[6]
Amici contend, despite the plain meaning of “impairment,” that asymptomatic HIV infection is always a physical impairment. This proposition has some decisional support. See Abbott, 107 F.3d at 939 (concluding that asymptomatic HIV infection is an impairment under the ADA); Gates v. Rowland, 39 F.3d 1439, 1446 (9th Cir.1994) (same). Specifically, Amici argue that the legislative history of the ADA establishes that Congress intended that asymptomatic HIV infection be considered an impairment. The Committee Reports cited by Amici, each employing identical language, state that the term “mental or physical impairments” includes
such conditions, diseases and infections as: orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, infection with the Human Immunodeficiency Virus, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, drug addiction, and alcoholism.
H.R.Rep. No. 101-485(11), at 51, reprinted in 1990 U.S.C.C.A.N. 303, 333; accord H.R.Rep. No. 101-485(111), at 28, reprinted in 1990 U.S.C.C.A.N. 445, 451; S.Rep. No. 101-116, at 22, reprinted in Arnold & Porter Legislative History of P.L. 101-336 (1994), available in WESTLAW, Americans with Disabilities Act of 1990-Legislative History (ADA-LH) database. As we have stated, however, the statutory meaning of “impairment” is plain and unambiguous. Accordingly, we have no reason to resort to the legislative history to ascertain Congress’s intent. See *169 Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984); Murphy, 35 F.3d at 145.
Moreover, the isolated references to HIV infection in the Committee Reports do not distinguish between symptomatic and asymptomatic conditions as the plain meaning of “impairment” requires. As a result, the Committee Reports, by their own terms, do not answer whether asymptomatic HIV infection is an impairment under the statute. We decline to conclude, based on the above-cited isolated statements in the legislative history, that Congress intended for the term “impairment” to include conditions that do not cause diminishing effects on the individual. Accordingly, we reject Amici’s argument that the legislative history broadens the plain statutory language. See Puerto Rico Dep’t of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 501, 108 S.Ct. 1350, 1354, 99 L.Ed.2d 582 (1988) (stating that “unenacted approvals, beliefs, and desires are not laws”); cf. Pittston Coal Group v. Sebben, 488 U.S. 105, 115, 109 S.Ct. 414, 420-21, 102 L.Ed.2d 408 (1988) (rejecting argument that legislative history at issue limited general statutory language).[7]
The plain meaning of “impairment” suggests that asymptomatic HIV infection will never qualify as an impairment: by definition, asymptomatic HIV infection exhibits no diminishing effects on the individual. Nevertheless, the ADA’s “of such individual” language requires that courts determine on an individualized, case-by-ease basis whether an individual’s asymptomatic HIV infection is a statutory disability. See Ennis, 53 F.3d at 59-60. In Ennis, for example, we considered whether a child’s asymptomatic HIV infection constituted a “disability” under the statute. We stated:
There is no evidence in the record before us that[the child] is impaired, to any degree, or that he currently endures any limitation, much less a substantial limitation, on any major life activity. His mother has candidly admitted that her son suffers no ailments or conditions that affect the manner in which he lives on a daily basis.
Id. at 60. Here, we could say much the same about Runnebaum. Runnebaum produced no evidence showing that he was impaired, to any degree, during the relevant time period. Runnebaum does not assert that he suffers an actual physical or mental impairment because of his HIV infection, nor could he credibly do so. He has been asymptomatic since being diagnosed in 1988 and, during the relevant time, suffered no diminishing effects from his HIV infection.
In completing the paperwork to effectuate his transfer from private banking to the trust department, Runnebaum unequivocally represented that he was not handicapped, signifying his own belief that he suffered no disability. Furthermore, he never once requested that NationsBank implement accommodations regarding any disability pursuant to the ADA. In fact, Runnebaum’s own physician, Dr. Michael Pistole, testified that Runnebaum “had no ill effects from the disease or the medications.” (J.A. at 154-55 (emphasis added).) Comporting with Dr. Pistole’s testimony, Runnebaum has consistently maintained that he endures no impairment. In light of the plain statutory language and the facts of this case, we hold that Runnebaum’s HIV infection, because it is asymptomatic, is not a “physical or mental impairment” under § 12102(2)(A) of the *170 ADA. Accordingly, Runnebaum’s asymptomatic HIV infection is not a disability under the statute.
ii. Substantial Limitation on the Major Life Activities
Second, even if asymptomatic HIV infection were an impairment, Runnebaum must prove that asymptomatic HIV infection substantially limits one or more of the major life activities. See 42 U.S.C.A. § 12102(2)(A). The term “major life activity” is not defined in the statute. See Kelly, 94 F.3d at 105 (citing Bolton v. Scrivner, Inc., 36 F.3d 939, 942 (10th Cir.1994)). We therefore must construe it in accordance with its ordinary or natural meaning. See Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 2053-54, 124 L.Ed.2d 138 (1993).
Webster’s defines “major” as “[demanding great attention or concern,” Webster’s II New Riverside University Dictionary 718 (1988); and, as “greater in dignity, rank, importance, or interest,” Webster’s Third New International Dictionary 1363 (1986). These definitions suggest that an activity qualifies under the statutory definition as one of the major life activities contemplated by the ADA if it is relatively more significant or important than other life activities. Conversely, the definitions suggest that a life activity that is relatively less significant than other life activities does not qualify as one of the ADA’s major life activities, and therefore does not trigger the statute’s definition of disability, regardless of the magnitude of the limitation caused by the given impairment.
Although a determination of disability under the statute calls for an individualized inquiry into whether the plaintiff is disabled, see Ennis, 53 F.3d at 59-60, the statutory language — with its reference to “the major life activities” — implies that a corresponding ease-by-ease inquiry into the connection between the plaintiff and the major life activity is not necessary. For example, working is one of the major life activities of the ADA, see Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir.1996), cert. denied, — U.S. -, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997), even though working may not be of particular “significance” or “importance” to a given plaintiff. Thus, courts need only consider whether the impairment at issue substantially limits the plaintiffs ability to perform one of the major life activities contemplated by the ADA, not whether the particular activity that is substantially limited is important to him. Cf. Abbott, 107 F.3d at 941 (suggesting that whether a particular activity is one of the major life activities under the statute is not a subjective inquiry).
Amici cite procreation and intimate sexual relations as the major life activities that are substantially limited by Runnebaum’s asymptomatic HIV infection. They do not explain why the activity of engaging in intimate sexual relations is one of the major life activities contemplated by the statute, but contend that “procreation is properly viewed as a ‘major life activity,’ since it is ‘one of the most fundamental of human activities.’” (EEOC Br. at 17 (quotation omitted); accord Whitman-Walker Br. at 19-20.) We agree that procreation is a fundamental human activity, but are not certain that it is one of the major life activities contemplated by the ADA.[8] Compare Krauel v. Iowa Methodist Med. Ctr., 95 F.3d 674, 677 (8th Cir.1996) (holding that procreation is not one of the major life activities under the ADA); Zatarain v. WDSU-Television, Inc., 79 F.3d 1143 (5th Cir.1996) (unpublished), aff'g 881 F.Supp. 240, 243 (E.D.La.1995) (same), mth Abbott, 107 F.3d at 941 (concluding that although “the question is very close,” procreation is a major life activity); McWright v. Alexander, 982 F.2d 222, 226-27 (7th Cir.1992) (assuming without deciding that reproduction is one of the major life activities under the Rehabilitation Act). Furthermore, *171 we are not convinced that engaging in intimate sexual relations falls within the statutory rubric of the major life activities.
Assuming, however, that procreation and intimate sexual relations are major life activities protected by the ADA, Runnebaum must still prove that asymptomatic HIV infection substantially limits his ability to procreate or engage in intimate sexual relations. See 42 U.S.C.A. § 12102(2)(A). Amici contend that Runnebaum’s HIV infection, “even if asymptomatic, substantially limits ... procreation and intimate sexual relations ... because of concerns that the offspring or partner will be infected with the virus.” (EEOC Br. at 10; accord Whitman-Walker Br. at 19-21.) As support for this proposition, Amici cite to a memorandum prepared by the Justice Department’s Office of Legal Counsel. Issued September 27, 1988, the memorandum discusses the application of identical provisions of the Rehabilitation Act to asymptomatic HIV-infected individuals. See Memorandum from Douglas W. Kmiee, Acting Assistant Attorney General, Office of Legal Counsel, to Arthur B. Culvahouse, Jr., Counsel to the President (Sept. 27, 1988), reprinted in 8 Fair Empl. Prac. Manual (BNA) No. 641 at 405:4-7 [hereinafter Kmiee Memorandum]. The memorandum, however, is more limited than Amici claim. Rather than definitively interpreting the statute, it attempts to predict how courts will resolve the question of whether asymptomatic HIV infection substantially limits one or more of the major life activities, and speculates that “at least some courts would find” that asymptomatic HIV infection substantially limits “procreation and intimate personal relations.” (Kmiee Memorandum at 405:6.)
Specifically, the memorandum suggests that some courts will find that asymptomatic HIV infection substantially limits procreation because asymptomatic HIV-infected individuals will forego having children because of “the fear of what the infection will do to one’s child.” (Kmiee Memorandum at 405:7.) The memorandum also predicts that “some courts can be expected to find a limitation of a major life activity in the fact that an asymptomatic HIV-infected individual’s intimate relations are also likely to be affected by HIV infection.” Id. In sum, the memorandum posits that some courts will find that asymptomatic HIV infection substantially limits procreation and intimate sexual relations because asymptomatic HIV-infected individuals will choose to forego having children and engaging in intimate relationships because of their contagiousness.
The memorandum equivocates, however, recognizing that finding a limitation of life activities based on the asymptomatic individual’s response to his knowledge of his infection is “not fully persuasive since it depends upon the conscience and good sense of the person infected.” Id. The ADA’s statutory language requires that the impairment substantially limit one or more of the major life activities. See 42 U.S.C.A. § 12102(2)(A). In the case of asymptomatic HIV infection, however, the memorandum acknowledges that it is “the conscience or normative judgment of the particular infected person,” not the impairment, that substantially limits procreation and intimate sexual relations. (Kmiee Memorandum at 405:7 (emphasis added).) As the memorandum confesses, “there is nothing inherent in the infection which actually prevents either procreation or intimate relations.” Id.
Although conceding that asymptomatic HIV infection does not prevent either procreation or intimate relations, the memorandum nevertheless postulates that “in any case where the evidence indicates that the plaintiff HIV-infected individual has in fact changed his or her behavior — as, for example, where the plaintiff represents that procreation has been foregone — the court might well find a limitation of major life activity.” Id. Thus, the memorandum qualifies its prediction that at least some courts will find asymptomatic HIV infection substantially limits procreation or intimate sexual relations, and bases its prediction on the notion that a person’s reaction to his impairment may serve to create a statutory disability. “Moreover,” the memorandum suggests, “courts may choose to pass over such factual questions ... [and find] a life activity limitation based on the reaction of others to the infection.” Id. The memorandum therefore bases its prediction that some courts will find *172 that asymptomatic HIV-infection is an actual disability on both the actual disability and perceived disability prongs of the statutory definition. (Kmiec Memorandum at 405:6.)
We hold that asymptomatic HIV does not substantially limit procreation or intimate sexual relations for purposes of the ADA. As the Kmiec Memorandum recognizes, nothing inherent in the infection actually prevents either procreation or intimate relations. Asymptomatic HIV-infected individuals are able to, and indeed do, procreate and engage in sexual intimacies. We recognize that as a behavioral matter, asymptomatic HIV-infected individuals may refrain from having children or engaging in sexual relations “because of concerns that the offspring or partner will be infected with the virus.” (EEOC Br. at 10; accord Whitman-Walker Br. at 19-21.) But as a physical matter; nothing inherent in the virus substantially limits procreation or intimate sexual relations. The statutory language is plain: the impairment in question, not the individual’s reaction to the impairment, must “substantially limit[ ] one or more of the major life activities of such individual.” 42 U.S.C.A. § 12102(2)(A). This language requires a causal nexus between the physical effect of the impairment and one of the major life activities. For example, a paralyzed individual's paralysis is what substantially limits his ability to walk, and a deaf person’s deafness is what substantially limits his ability to hear. In the ease of asymptomatic HIV infection, however, an individual’s reaction to the knowledge of his infection — not the infection itself — is what, if anything, substantially limits procreation and intimate sexual relations. Thus, under the statutory definition, asymptomatic HIV infection is not a disability-
Even if the statute permitted a finding that asymptomatic HIV infection substantially limits procreation and intimate sexual relations because of a person’s response to the knowledge of his infection, there is no evidence in the record that Runnebaum, because of his infection, forewent having children or engaging in intimate sexual relations. Nothing in the record indicates that Runnebaum refrained from having children out of fear that he would pass the virus on to his child. Indeed, nothing in the record so much as suggests that Runnebaum was at all interested in fathering a child. Moreover, the record makes clear that Runnebaum’s ability to engage in intimate sexual relations was not substantially limited by his HIV infection; the record shows that he concealed his HIV infection from his lover. Ergo, Runneb-aum’s HIV infection, if an impairment, does not substantially limit one or more of the major life activities under § 12102(2)(A).
b. Section 12102(2)(C)— Perceived Disability
Subsection (C) states that the term “disability” means “being regarded as having such an impairment.” 42 U.S.C.A. § 12102(2)(C). The “such an impairment” language incorporates by reference subsection (A)’s description of the sort of impairment that qualifies as a disability: “a physical or mental impairment that substantially limits one or more of the major life activities of such individual.” 42 U.S.C.A. § 12102(2)(A). Thus, the ADA protects from employment discrimination individuals who are regarded or perceived, albeit erroneously, as having an impairment that substantially limits one or more of the major life activities, just as it protects persons who actually have an impairment that substantially limits one or more of the major life activities. Contrary to Amici, who primarily contend that HIV infection is actually an impairment that substantially limits one or more of the major life activities, Runnebaum primarily contends that NationsBank fired him because it regarded him as having an impairment that substantially limits one or more of the major life activities. Our analysis of this claim focuses on the reactions and perceptions of the relevant decisionmakers working with Runnebaum. See Ennis, 53 F.3d at 60-61 (discussing evidence to support claim that “relevant decisionmakers” knew of an employee’s son’s asymptomatic HIV infection); see also Henson v. Liggett Group, Inc., 61 F.3d 270, 276 (4th Cir.1995) (holding that in discrimination context, perceptions of nondeeisionmakers are of low probative value); Smith v. Flax, 618 F.2d 1062, 1067 (4th *173 Cir.1980) (“It is the perception of the decision maker which is relevant.”); cf. Kelly, 94 F.3d at 109 (focusing on “the reactions and perceptions of the persons interacting or working with” the plaintiff).
In support of this claim, Runnebaum contends that NationsBank regarded him as having an impairment that substantially limits one or more of the major life activities, even though his asymptomatic HIV infection did not actually do so, because the bank was aware of his asymptomatic HIV infection. In School Bd. of Nassau County v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Supreme Court interpreted the identical language of the Rehabilitation Act and held that although an individual may not have an impairment that substantially limits one or more of the major life activities of that individual, the negative reactions of others “could nevertheless substantially limit that person’s ability to work.” Id. at 283, 107 S.Ct. at 1128. The Court stated that by including “regarded as” in the statutory definition, “Congress acknowledged that society’s accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment.” Id. at 284, 107 S.Ct. at 1129.
We reject Runnebaum’s argument that he was fired because the relevant decisionmak-ers at NationsBank held a perception of HIV infection based on “accumulated myths and fears.” The evidence produced by Runneb-aum revealed (1) that packages sent to the bank (addressed to Runnebaum) containing AZT were twice inadvertently opened by bank personnel; (2) that Brown, a bank supervisor and Mend and confidant of Runneb-aum’s, felt “panicky” and “uncontrolled” at the time he learned of Runnebaum’s HIV infection; and (3) that Pettit fired him. None of this evidence, however, is sufficient to create a genuine issue of material fact concerning the perception of Runnebaum’s HIV infection held by the relevant decisionmakers at NationsBank.[9]
First, the unknown employees who inadvertently opened the packages containing Runnebaum’s AZT medication were not relevant decisionmakers. Furthermore, nothing in the record establishes that the employees who accidentally opened the packages regarded Runnebaum as having an impairment that substantially limited one or more of the major life activities. In addition, the packages were opened well after Pettit had decided to fire Runnebaum; indeed, one of the packages was accidentally opened after Runnebaum had already been fired. In sum, there is no permissible inference that can be drawn from this evidence.
Second, Brown’s testimony that he felt “panicky” and “uncontrolled” at the time Runnebaum confided in him is simply insufficient to create a genuine issue of material fact. Although Brown was a bank supervisor, there is no proof that his “panicky,” “uncontrolled” feeling meant that he (or the bank) regarded Runnebaum’s asymptomatic HIV infection as an impairment that substantially limited one of the major life activities. Even assuming Brown was a relevant decisionmaker with respect to Runnebaum, the mere fact that an employer is aware of an *174 employee’s asymptomatic HIV infection “is insufficient to demonstrate either that the employer regarded the employee as disabled [ie., as having an impairment that substantially limits one or more of the major life activities of such individual] or that that perception caused the adverse employment action.” Kelly, 94 F.3d at 109; accord Chandler v. Dallas, 2 F.3d 1385, 1393 (5th Cir.1993) (holding that even employer’s belief that plaintiff could not perform a particular task safely does not establish that employer regarded plaintiff as having an impairment that substantially limits one or more of the major life activities). Here, the record establishes that NationsBank did not consider HIV-positive employees to have an impairment that substantially limits one or more of the major life activities. To the contrary, the record reveals, and Runnebaum does not dispute, that NationsBank employs several individuals it knows to be infected with HIV.
Third, and most important, there is no indication that Pettit, the relevant decisionmaker with respect to Runnebaum’s termination, regarded Runnebaum as having an impairment that substantially limited one or more of the major life activities. Although Pettit knew that Runnebaum was HIV-positive when she discharged him, she did not possess this knowledge when she decided to fire him on November S, 1992. In her deposition, she testified that she learned in late November or early December that Runnebaum was infected with HIV, but by then she had already decided to fire him. Furthermore, she testified that Runnebaum’s asymptomatic HIV infection played no role in her decision to fire him. Pettit’s testimony on this point was corroborated by Brown, who stated that he did not disclose to her that Runnebaum was HIV-positive until after Pet-tit informed Brown that she planned to discharge Runnebaum. Even assuming Pettit learned by some other means about Runnebaum’s HIV infection prior to making the decision to fire him, nothing in the record suggests that she regarded asymptomatic HIV infection to be an impairment that substantially limited one or more of the major life activities of Runnebaum.
Quite simply, Runnebaum did not hold himself out to NationsBank as having an impairment that substantially limited one or more of the major life activities, Nations-Bank did not regard or perceive Runnebaum as having such an impairment, and the record does not contain evidence demonstrating otherwise. Cf. Rogers v. Int’l Marine Terminals, Inc., 87 F.3d 755, 757, 760 (5th Cir.1996) (affirming summary judgment because the record was devoid of evidence showing that employer regarded employee as having an impairment that substantially limited one or more of the major life activities). Run-nebaum’s HIV infection therefore is not a disability under § 12102(2)(C). Because Runnebaum failed to show that he is disabled under the ADA, he failed to establish, the first element of the prima facie case.
2. Legitimate Expectations of Employer
Next, to make out the third element of the prima facie case,[10] Runnebaum must prove that he was meeting NationsBank’s legitimate expectations at the time of his discharge. The record is replete with indications that Runnebaum did not meet NationsBank’s legitimate expectations for his employment. He failed to submit required reports, to attend certain functions, and to take training classes or attend manager’s meetings, as set forth in the July Memorandum. His continuing utter failure to attend to his assigned duties establishes that he was not meeting NationsBank’s expectations for his performance. See Ennis, 53 F.3d at 61-62 (concluding that an ADA plaintiff could not prove that she satisfied her employer’s legitimate expectations because her work was substandard); Ang v. Procter & Gamble Co., 932 F.2d 540, 548-49 (6th Cir.1991) (ruling that failure to perform reasonable tasks at an employer’s demand constitutes not satisfying legitimate employment expectations); Kephart v. Institute of Gas Tech., 630 F.2d 1217, 1223 (7th Cir.1980) (per curiam) (holding that if an employee is *175 not doing as he is told to do, then he is not performing his job).
Moreover, during his tenure at Nations-Bank Runnebaum engaged in a pattern of unprofessional behavior. His conduct frequently veered from the merely unprofessional to the inappropriate and offensive. His penchant for racial and sexual slurs and his improper conduct at business meetings and toward NationsBank clients cannot be considered to fall within the scope of Nati-onsBank’s legitimate expectations for his employment.[11] Accordingly, we conclude that Runnebaum failed to establish the third element of the prima facie case.
3. Reasonable Inference of Unlawful Discrimination
The fourth element that Runnebaum must satisfy to establish a prima facie ease is that his termination transpired under circumstances that raise a reasonable inference of unlawful discrimination. For many of the same reasons that Runnebaum failed to establish the first and third elements, we conclude that he failed to establish the fourth element. Runnebaum was discharged for incompetent performance, lack of performance, and unprofessional conduct. The undisputed facts establish these reasons for his discharge, and Runnebaum attempts to ascribe discrimination to NationsBank’s conduct. Given his short employment tenure at NationsBank, the troubles he encountered from the outset, his deficient performance, and his inappropriate conduct, no rational trier of fact could conclude that his termination raised a reasonable inference of unlawful discrimination. See Ennis, 53 F.3d at 62 (holding that because evidence of plaintiffs deficient performance was so pervasive, no rational trier of fact could conclude that her discharge occurred under circumstances giving rise to an inference of discrimination). We therefore conclude that Runnebaum failed to establish the fourth element of a prima facie case.
‡ * * H* * ❖
Runnebaum thus failed to establish three of the four elements of a prima facie case of discrimination under the ADA. He failed to show that he had a disability and that he therefore was a member of the class of persons protected by the ADA; he failed to show that at the time he was fired he was meeting NationsBank’s legitimate expectations; and he failed to show that his termination took place under circumstances raising a reasonable inference of discrimination. We therefore affirm the district court’s grant of summary judgment in favor of NationsBank. See St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 506-11, 113 S.Ct. 2742, 2746-49, 125 L.Ed.2d 407 (1993).[12]
III. THE ERISA CLAIM
In Conkwright v. Westinghouse Electric Corp., 933 F.2d 231, 239 (4th Cir.1991), we concluded that to prevail on a § 510 ERISA claim, a plaintiff may resort to the proof scheme articulated by McDonnell Douglas. As goes Runnebaum’s ADA claim, so goes his ERISA claim. For the same reasons that Runnebaum cannot establish a prima facie case under the ADA, he cannot establish a prima facie case under § 510. Ac *176 cordingly, we affirm the grant of summary judgment in favor of NationsBank on Run-nebaum’s § 510 ERISA claim.
IV. CONCLUSION
We conclude that the district court properly granted summary judgment in favor of NationsBank. Runnebaum failed to establish a prima facie case of discrimination or to raise any genuine issues of fact sufficient to survive summary judgment. Even assuming that Runnebaum established a prima facie case of discrimination, NationsBank came forward with legitimate, nondiscriminatory reasons for firing him, which Runnebaum failed to prove were pretextual. The opinion and order of the district court below is therefore affirmed.

AFFIRMED.

. In addition to the briefing we received from the parties, we accepted amicus curiae briefs from the Equal Employment Opportunity Commission and the Whitman-Waiker Clinic, Incorporated. We thank Amici for their participation.

. Runnebaum also devoted a great deal of time to advancing his acting career and his own corporation, Wilmarc Productions, while ostensibly working for NationsBank. He also wrote numerous personal letters and invitations on company time and with company equipment.

. Runnebaum’s complaint may also be read to allege that he. is disabled because of his homosexuality. As the district court correctly noted, and as Runnebaum conceded at oral argument, the ADA specifically excludes homosexuality as a disability. See 42 U.S.C.A. § 12211(a) (West 1995).

. The district court assumed, "for the purposes of the [summary judgment] motion, that even an asymptomatic HIV infection may be a disability within the [A]ct.” (J.A. at 570.) The dissent contends that "NationsBank conceded Runneb-aum's disability in district court,” post at 177, and therefore waived its right to argue on appeal that Runnebaum is not disabled under the ADA. The dissent also contends that "Runnebaum has had no opportunity to present facts about disability,” post at 176, and that Runnebaum "had no hint that he should have been developing or making a summary judgment record on disability," post at 178. Runnebaum, however, knew that he bore the burden of developing a summary judgment record in support of his contention that he was a member of the protected class. In paragraph 24 of his Complaint, Runnebaum alleged that he was "a qualified individual and a person with a disability as defined under the [ADA] due to his HIV-positive status.” (J.A. at 6.) In its Answer, NationsBank did not concede this allegation: “NationsBank is without knowledge or information sufficient to form a belief as to the truthfulness of the allegations in paragraph 24, but states that plaintiff did not perform competently the essential functions of the position which he held at the time of this termination.” (J.A. at 15.) Thus, Runnebaum knew (or should have known) that NationsBank was not conceding that he was a member of the protected class and that he therefore needed to develop facts establishing that he was a member of the protected class, i.e., that he had a statutory disability. Hence, addressing the "protected class” prong of the prima facie case in no way prejudices Runnebaum as the dissent contends.
Furthermore, Runnebaum had ample opportunity to present facts about his alleged disability. NationsBank filed its Answer in this case on December 8, 1993, after which a lengthy discovery period ensued. Indeed, NationsBank did not file its motion for summary judgment until June 27, 1994, over six months later. The discovery materials forming the record in this case are voluminous, and include numerous documents concerning Runnebaum's firing and, importantly, lengthy depositions of Runnebaum and Dr. Michael Pistole, Runnebaum's own medical expert. As discussed more extensively below, the facts developed by Runnebaum over the course of this lengthy discovery period unequivocally show that he was not impaired during the relevant time period. Any additional evidence developed by Runnebaum showing that he actually suffered diminishing effects from his HIV infection would necessarily contradict his own sworn testimony and the sworn testimony of his doctor. Cf. Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975-76 (4th Cir.1990) (disregarding affidavit of witness that contradicted witness's own prior sworn deposition testimony); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir.1984) (same). With respect to perceived disability, the record could not be developed further: Pettit, the relevant decisionmaker with respect to Runnebaum, was deposed; numerous other bank employees were deposed; and the documents pertaining to Runnebaum's firing were discovered. There simply are no more facts to be developed, and Runnebaum makes no argument that there are.
In addition, NationsBank has never conceded that Runnebaum's HIV infection constitutes a disability under the ADA. In its Memorandum in Support of Summary Judgment and its Reply Memorandum in Support of Summary Judgment, NationsBank assumed that Runnebaum was a member of the class protected by the ADA because of his HIV infection. Viewing the summary judgment record as a whole, however, reveals that NationsBank's statements in this regard have more to do with summary judgment strategy than with an express concession of a necessary element on which Runnebaum bore the burden of production. In its Memorandum in Support of Summary Judgment (the same document in which the dissent contends Nations-Bank conceded that Runnebaum is a member of the protected class), NationsBank stated:
At no time during plaintiff's employment by NationsBank did [Runnebaum] request an accommodation pursuant to the Americans with Disabilities Act. At no time during his employment with NationsBank did [Runnebaum] request a job change for disability reasons. To the contrary, he stated he was not disabled. Moreover, since 1988 [Runnebaum] has been asymptomatic with respect to his HIV-positive condition. In fact,[Runnebaum’s] own medical expert, Dr. Michael Pistole, stated that[Runnebaum] is in better health today with respect to the HIV virus than when he first sought treatment in 1988.
(J.A. at 42-43 (citations to summary judgment exhibits omitted).) As the Memorandum itself reveals, NationsBank did not concede that Run-nebaum’s HIV infection constitutes a statutory disability.
In any event, we are not bound by either NationsBank’s summary judgment strategy or the district court's assumption that asymptomatic HIV infection is a disability. See Shafer v. Preston Memorial Hosp., 107 F.3d 274, 275 n. 1 (4th Cir.1997) ("We have consistently recognized that we may affirm a district court’s decision on different grounds than those employed by the
*166 district court.”); Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir.1993) (same). Indeed, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.” Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). On the facts of this case, it is evident that given additional opportunity, Runnebaum could not develop the record further on the issue of whether he actually has, or was perceived as having, an impairment that substantially limits one or more of the major life activities. Whether asymptomatic HIV infection is a disability under the statute is primarily a question of law, the facts pertaining to this issue are sufficiently developed, and the issue was briefed and argued on appeal. Accordingly, we consider whether Runnebaum’s HIV infection constitutes a disability under the statute.

. Although a finding of disability under the statute must be made on a case-by-case basis, see Ennis v. National Ass’n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 59 (4th Cir.1995), we recognize that some conditions will always constitute impairments that substantially limit the major life activities of the afflicted individual. For instance, blindness and deafness are physical conditions that always substantially limit the major life activities of blind and deaf individuals. In such cases, an individualized determination of whether the condition is an impairment that substantially limits one or more of the major life activities is unnecessary.

. The dissent concedes that the statutory term "impairment” requires diminishing effects on the individual, but then contends that asymptomatic HIV infection produces such diminishing effects. See post at 179-81. As support for this contention, the dissent cites and quotes popular and scientific literature stating that HIV and the body’s immune system engage in "mortal combat," that HIV "attacks" the body's immune system, and that the body's immune system "counterattack[s]'' the virus. Post at 179-80. Battlefield allusions aside, we are not convinced that "diminishing effects” can be analyzed at so low a level of generality. See Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 2053-54, 124 L.Ed.2d 138 (1993) (statutory language must be construed in accordance with its ordinary or natural meaning). Advancements in genetic research, for example, have given doctors and scientists the increasing ability to identify seemingly healthy individuals who will develop various serious diseases. What these doctors and scientists have discovered is that serious diseases — like ovarian and breast cancer, Alzheimer's, and Muscular Dystrophy— lurk in the genes, and perhaps the futures, of millions of apparently healthy people. Under the dissent’s logic, such otherwise healthy individuals would be impaired for purposes of the ADA. See post at 181 (asserting that "the body is impaired as soon as the disease enters it”). The *169 term "impairment,” however, does not extend so far.

. Like Amici, the dissent relies heavily on what it characterizes as the "wealth of legislative history," post at 176, supporting its proposition that asymptomatic HIV infection is an impairment that substantially limits one of the major life activities contemplated by the ADA. Specifically, in addition to citing the Committee Reports (which we find unhelpful), the dissent cites and quotes floor statements made by Senator Kennedy, and Representatives McDermott, Owens, and Waxman. See post at 182. The dissent refers to these floor statements to demonstrate what it describes as "the breadth of the congressional presumption that individuals with HIV would be covered.” Post at 182. Even if we believed that the collective intent of a 535-member body is ascertainable by reference to legislative history (which we doubt), we find it unfathomable that the statements of one Senator and three Congressmen could serve as the expression of that collective intent. We choose instead to adhere to "the strong presumption that Congress expresses its intent through the language it chooses.” INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987).

. Amici argue that the "fact that reproduction is recognized as a fundamental right under the Constitution also supports the view that it is a 'major' life activity.” (EEOC Br. at 19; accord Whitman-Walker Br. at 21 n.5.) The constitutionally-protected status of an activity, however, has little, if any, bearing on whether or not an activity is one of the major life activities contemplated by the ADA. Neither gathering in a group nor carrying a firearm are one of the major life activities under the ADA, though individuals have the constitutional right to peaceably assemble, see U.S. Const, amend. I; and to "keep and bear Arms," U.S. Const, amend. II.

. The dissent claims that this “evidence is bolstered by a variety of circumstantial evidence,” including “evidence that the reasons given for Runnebaum's firing were pretextual.” Post at 187. Specifically, the dissent points to ostensibly comparative evidence showing that another employee in the same sales position as Runnebaum, Clifford Andersson, was not disabled and remained employed, despite his similarly inferior sales performance. See post at 187-88, 189. However,
[t]he pitfalls of divining any valid inferences from a comparison between Runnebaum and Andersson are manifold. As an initial matter, Runnebaum was not terminated exclusively because he failed to meet sales goals; he was also terminated for absenteeism, tardiness, and improper conduct, and there is no evidence that Andersson exhibited similar shortcomings. Comparing Andersson and Runnebaum, therefore, is improper.... In addition, Andersson worked in Washington, D.C., while Runneb-aum worked in Baltimore, and there is no evidence that these two markets are similar.
Runnebaum v. NationsBank of Maryland, 95 F.3d 1285, 1307 (4th Cir.1996) (Williams, J., dissenting) (citations omitted). Thus, evidence that An-dersson remained employed despite inadequate sales performance does not support a conclusion that NationsBank’s reasons for firing Runneb-aum were pretextual, nor does it "bolster” the dissent's contention that NationsBank regarded Runnebaum as disabled.

. The parties do not dispute that Runnebaum was discharged from his employment, the second element of the prima fade case.

. The facts surrounding Runnebaum’s failure to establish the third element of the prima facie case, that he was meeting NationsBank’s legitimate expectations at the time of his discharge, are extensively discussed in the dissenting opinion to the panel decision. See Runnebaum v. NationsBank of Maryland, 95 F.3d 1285, 12971300, 1303-05 (4th Cir.1996) (Williams, J„ dissenting).

. Even if Runnebaum had succeeded at making out a prima facie case of discrimination, we conclude that NationsBank articulated legitimate, nondiscriminatory reasons for his discharge, and that Runnebaum failed to prove that those reasons were pretextual. See Runnebaum v. NationsBank of Maryland, 95 F.3d 1285, 1297-1300, 1305-07 (4th Cir.1996) (Williams, J., dissenting). NationsBank terminated Runnebaum for failure to fulfill his sales goals and for failure to amend his unprofessional conduct. These are legitimate, nondiscriminatoiy reasons to discharge Runnebaum. See Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3rd Cir.1995); Nitschke v. McDonnell Douglas Corp., 68 F.3d 249, 250-52 (8th Cir.1995); Ray v. Tandem Computers, Inc., 63 F.3d 429, 433 (5th Cir.1995). The district court therefore properly granted summary judgment in favor of NationsBank on this alternative ground. See St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 506-11, 113 S.Ct. 2742, 2746-49, 125 L.Ed.2d 407 (1993).