UNITED STATES of America, Plaintiff,

v.

HAPPY TIME DAY CARE
CENTER, Defendant.

UNITED STATES of America, Plaintiff,

v.

Kiddie RANCH, Defendant.

UNITED STATES of America, Plaintiff,

v.

ABC NURSERY, INC., Defendant.

Nos. 97–C–439–C, 97–C–
440–C, 97–C–441–C.

United States District Court,
W.D. Wisconsin.

April 13, 1998.

David E. Jones, Assistant U.S. Attorney, Madison, WI, for U.S.

Joseph D. Hill, Hill Law Office, Madison for Happy Time Day Care Center.

Christopher Kinast, Kinast Law Office, Beloit, WI, for Kiddie Ranch.

Robert G. Krohn, Roethe, Krohn & Pope, Edgerton, WI, for ABC Nursery, Inc.

Barrett J. Corneille, Corneille Law Group, Madison, WI, for Capitol Indemnity Corp.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for declaratory, injunctive and monetary relief for violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213. Plaintiff United States of America alleges that in 1996, defendants Happy Time Day Care Center, Kiddie Ranch and ABC Nursery, Inc. violated the act by discriminating against a minor child, L.W., and the child's legal guardian, Rosetta McNuckle, on the basis of L.W.'s HIV-positive status. Plaintiff seeks a declaration that the defendant day care centers violated the act, an injunction precluding further viola-

tions, monetary damages in favor of L.W. and McNuckle for humiliation, emotional distress, frustration and anxiety, and a civil penalty against the day care centers. In an order entered February 19, 1998, I granted summary judgment in favor of the day care centers' insurance company, holding that it has no duty to defend or indemnify its insured in these actions.

The case is now before the court on defendants' motion for summary judgment. Under the ADA, individuals may establish that they are disabled in three ways: because of an "actual" disability, a record of a disability or because they are regarded by others as having a disability. Defendants argue that plaintiff has failed to establish that L.W. is disabled under any of these tests. They assert that L.W. is not actually disabled within the meaning of the ADA because HIV is not a physical impairment that substantially limits one or more of his major life activities. In particular, they argue that procreation is not a "major life activity" and, even it were, L.W.'s ability to procreate is not substantially limited. Defendants contend that L.W. does not qualify as disabled under the other two tests prescribed by the act because he has no "record of impairment" and because they did not regard him as disabled. In response, plaintiff maintains that it is appropriate to conclude that a three-year old's ability to procreate is substantially limited because the statute does not require an individual to demonstrate any interest or intent to engage in the activity in order to satisfy the "substantially limited" element. In the alternative, plaintiff argues that L.W. is disabled under the first test because HIV has substantially limited his ability to engage in the major life activities of caring for oneself, growing, socializing and living. Moreover, even if L.W. does not have an actual disability, he is covered under the other two tests for determining whether an individual is disabled under the act because: 1) his hospitalization establishes a "record of impairment;" and 2) defendants regarded him as disabled by refusing to enroll him because of the myths and fears associated with HIV.

I conclude that there is a genuine dispute whether L.W. is disabled within the meaning

of the ADA. Although plaintiff has failed to establish a record of impairment and although procreation may not be the basis of an actual disability for a three-year old, plaintiff has adduced sufficient evidence from which a jury could find that HIV has substantially limited L.W.'s major life activity of caring for himself. Furthermore, there is a genuine dispute whether defendants regarded L.W. as disabled. Accordingly, defendants' motion will be denied.

On a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Oates v. Discovery Zone,* 116 F.3d 1161, 1165 (7th Cir.1997). For the purpose of deciding the motions for summary judgment, I find from the parties' proposed findings of fact that there is no genuine dispute with respect to the following material facts.

## UNDISPUTED FACTS

Defendants Happy Time Day Care Center, Kiddie Ranch and ABC Nursery, Inc. are public accommodations providing day care and nursery services for children in and around Beloit, Wisconsin. L.W. is an African–American male born on December 27, 1992. Since at least 1994, he has tested positive for the Human Immunodeficiency Virus (HIV), the virus believed to be the causative agent of Acquired Immune Deficiency Syndrom (AIDS). Rosetta McNuckle is L.W.'s aunt and legal guardian.

### A. *L.W.'s Health, Development and Medical Treatment*

Dr. James Gern is a pediatric allergist and immunologist and an Assistant Professor in Pediatrics at the University of Wisconsin Hospital & Clinics in Madison, Wisconsin. Dr. Gern is board certified in pediatrics, allergy and immunology and he performs research in virology. Since 1994, he has been L.W.'s treating physician and he is familiar with L.W.'s medical records and history. Since January 1995, Dr. Gern has attempted to treat L.W.'s HIV infection by prescribing the drugs AZT and TMP–SMX, which is a prophylactic medication to prevent a type of pneumonia that is a common opportunistic infection in HIV-positive patients.

Dr. Catherine M. Wilfert is Professor Emerita of Pediatric Infectious Diseases at Duke University Medical. Center in Durham, North Carolina. She is certified by the American Board of Pediatrics and she has taught in the field of pediatric medicine at Duke since 1969. She has significant experience in the clinical treatment of children with HIV, is the Scientific Director of the Pediatric AIDS Foundation, has published extensively on the subject of pediatric AIDS and is the co-editor of a standard medical textbook on children with HIV. Dr. Wilfert has reviewed L.W.'s medical records.

L.W.'s HIV infection is contagious through contact between L.W.'s blood and the blood of another person. Should he reach puberty, L.W.'s HIV infection will be contagious through sexual contact. HIV infection manifests itself by, among other things, impairing the nervous system and attacking and destroying CD4+ T cells, which are lymphocytes (white blood cells produced by bone marrow that mature in thymus and lymphoid tissue). CD4 lymphocytes are responsible for responding to infectious agents. As L.W.'s HIV infection causes his T cell count to diminish, he will become more vulnerable to infections and diseases caused by such agents. HIV causes a physiological disorder of the hemic (blood) and lymphoid systems. L.W. has experienced some of the debilitating effects of HIV. For example, in November 1995, he contracted chicken pox and had to be hospitalized for four days because of concerns about his HIV infection. While in the hospital, L.W. was treated with the antiviral drug acyclovir. Also, he was diagnosed with thrush, which was treated with nystatin. Ordinarily, children without HIV are not hospitalized for chicken pox and do not undergo treatment with acyclovir.

In general, a T cell count for a child between the ages of one and five is not considered normal until it registers at or above 1,000. At the time L.W. was discharged from the hospital, his T cell count had fallen to 330. This led Dr. Gern to begin a new

treatment regime for L.W., consisting of AZT, TMP–SMX and didnosine (DDI). In April 1997, Dr. Gern substituted 3TC for DDI. Also, he tried to have L.W. take a protease inhibitor but L.W. could not tolerate the taste so this medication was stopped. Although the dosage and frequency of L.W.'s medications have varied, since March 1996 he has taken AZT three times a day. In addition, he takes 3TC twice a day and TMP–SMX twice a day three times a week. L.W. took DDI twice a day and the protease inhibitor three times a day during the period Dr. Gern prescribed these drugs.

L.W.'s treatment regime has temporarily stabilized his T cell count. AZT, DDI and 3TC appear to slow the onset of AIDS in persons infected with HIV and these drugs may reduce the speed at which L.W.'s T cells are being destroyed. Without these drugs, it is likely that L.W.'s T cell count would be lower than it is today and he would be more vulnerable to opportunistic infections. AZT, DDI and 3TC can cause gastrointestinal and nutritional problems through such side effects as loss of appetite, nausea, anemia and pancreatitis. As a result of being infected with HIV, L.W. must take these medications, submit blood tests and visit health care facilities on a regular basis. HIV has an ability to mutate and become resistant to drugs, rendering them ineffective. Thus, it is likely that L.W. will have to change to other medications that have adverse side effects similar to those of AZT, 3TC and DDI.

There is no cure for HIV; to date, it is inevitably fatal. It is statistically certain that L.W.'s HIV infection will progress to AIDS, which will depress his immune system profoundly. Consequently, L.W. will suffer from fatal opportunistic infections and complications such as pneumonia, intractable diarrhea, and decline in central nervous system function. The prognosis for L.W. is that he will die as a direct consequence of his HIV infection; the likelihood that he will reach his ninth or tenth birthday is only 50%.

In Dr. Wilfert's opinion, the term "asymptomatic" is a misnomer that is not an accurate reflection of the effect that HIV infection has on L.W. Dr. Gern does not categorize L.W. as asymptomatic. The Centers for Disease Control and Prevention have established a diagnostic chart that allows physicians to categorize a person with HIV depending on how the infection manifests itself. Dr. Gern has concluded that L.W. falls in the range of categories B–2 (moderately symptomatic and moderately immunosuppressed) to C–2 (severely symptomatic with moderate immune suppression). A child with T cell levels in the range exhibited by L.W. has a diminished ability to fight off diseases compared to children with normal T cell ranges. According to the Centers for Disease Control chart, a child age in category B–2 has a mean or average life span of 99 months and a median life span of 81 months; in C–2, a child has a mean life span of 34 months and a median life span of 23 months. The normal life expectancy of an African–American male is 64 years. At least since 1994, L.W.'s HIV infection has had the physiological effect of causing his growth to fall well below the fifth percentile for height and weight. In children, AIDS is associated frequently with "failure to thrive," a condition defined as a subnormal rate of growth and weight gain. In December 1994, L.W. was diagnosed with failure to thrive and he continues to have this condition. Even for a child his age, L.W. is small. For example, in November 1997, L.W. was 37 inches tall. At that time, he was 4 years and 10 months old but he was the size of an average child at 2 years and 9 months of age. L.W.'s diagnosis with failure to thrive is one of the reasons his classification ranges from B–2 to C–2. In Dr. Gern's opinion, HIV infection is the most likely cause of L.W.'s growth delay although it may be a function of genetics as well. In Dr. Wilfert's opinion, L.W. will not recover from the effects of failure to thrive and this condition will continue to affect him until his early death.

From other developmental standpoints, L.W. is performing at an age appropriate level: he does all activities other children do in his Head Start program, including setting and accomplishing goals; he grooms, dresses and feeds himself normally; he has no mental impairment and no psychological or emotional problems; his social skills are above

average; he has had no health problems while he has been a student in the program; and he walks, sees, hears, breathes and speaks normally.

In fall 1996, L.W. was enrolled in the Rock/Walworth County Head Start program at the Sun Valley facility in Beloit, where he has attended school since 1996. There is a noticeable difference in size between L.W. and the other students in the program. Of the fifteen students in his class, L.W. and one other child are the smallest. Despite suffering from failure to thrive, L.W. has grown at a rate parallel to his peers. Also, his diminutive stature has not been an impediment in school or in the Head Start program and it has not been the source of negative treatment or teasing from other children. However, other students tend to "mother" L.W.

Unlike healthy individuals, children with HIV infection have a near-negligible opportunity to reproduce. Most likely, L.W. will have a delayed onset of puberty, the period in which persons without HIV develop the physiological capacity to reproduce. Given L.W.'s life expectancy, he will probably die before reaching puberty. Even if he were to survive long enough to reach puberty, he could not reproduce without imposing a serious risk of spreading his fatal disease to his partner or to his infant.

B. *Attempts to Enroll L.W. in Day Care Programs Run by Defendants*

L.W.'s aunt and legal guardian, Rosetta McNuckle, works from 10:00 p.m. to 6:00 a.m. Because McNuckle sleeps in the morning and early afternoon, L.W. must be in child care during this time. McNuckle obtains public assistance for L.W. from Rock County Human Services. Since January 1995, L.W.'s caseworker has been Pamela Casiday. In February 1996, when L.W. was three years old, Casiday gave McNuckle a list of child care centers that had been used previously by other clients.

Defendant Kiddie Ranch is owned and operated by Laura Jo Pearson. McNuckle contacted defendant Kiddie Ranch and initiated the process of getting L.W. admitted. On February 23, 1996, McNuckle called defendant Kiddie Ranch to advise it that Rock County Human Services would pay L.W.'s

tuition. In late February, McNuckle met with staff from defendant Kiddie Ranch and understood that L.W. could start on March 4, 1996. During this meeting, McNuckle said that L.W. was HIV-positive. On Friday, March 1 McNuckle returned to defendant Kiddie Ranch to leave a medical form required for L.W.'s admission to the program. Employees for defendant Kiddie Ranch did not tell McNuckle that she needed to pay a $20 registration fee or that she needed to submit an enrollment form, a home transportation agreement and a Rock County Human Services day care authorization form. On the morning of March 4, McNuckle left a message with Casiday saying that she had learned that L.W.'s place had been filled by someone else. Casiday called defendant Kiddie Ranch that same day after receiving McNuckle's message. When Casiday asked whether there were any openings for a child in L.W.'s age group she was told that defendant Kiddie Ranch had an opening for a three-year old. At some point after McNuckle contacted defendant Kiddie Ranch, Pearson called Anne Carmody, a day care licensing specialist with the Wisconsin Division of Children and Family Services. Pearson questioned Carmody about issues related to enrolling an HIV-positive child in her day care program.

In March 1996, McNuckle applied to defendant ABC Nursery. On March 13, 1996, she visited defendant ABC to pick up some registration forms and advised one of the employees that L.W. was infected with HIV. After returning home to fill out the forms, someone from defendant ABC called McNuckle to inform her that there were no openings for L.W.

In August 1996, McNuckle called defendant Happy Time Day Care Center and spoke with the owner, Eula Buchanan, who told McNuckle that there was an opening for L.W. On August 20, McNuckle met with Buchanan. At this meeting, McNuckle told Buchanan that L.W. was HIV-positive. That same day, Buchanan spoke with Casiday regarding her concerns about accepting a child with HIV. Casiday suggested that Maureen Churchill, an official with the Beloit Department of Health, could conduct a training

session for Happy Time staff. On August 21, Buchanan called Churchill, who visited the center that same day. Churchill advised Buchanan about the risks of transmission and about the importance of using universal precautions. At the end of the visit, Buchanan indicated that she was still confused about whether to admit L.W. On August 22, Buchanan called McNuckle to say that two of her staff member had threatened to quit if she accepted L.W. and that she would not be able to take him because then she would be understaffed. That same day, Casiday made the following notation regarding a conversation she had with McNuckle: "Day-care is probably canceling because staff will quit because of L.W.'s health condition, aunt says." Sometime after August 22, Buchanan called McNuckle to offer L.W. an afternoon vacancy, which conflicted with the time period in which McNuckle expected L.W. would attend Head Start. McNuckle did not accept this offer.

## OPINION

 Title III of the American with Disabilities Act prohibits discrimination "in the full enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation" by the owners and operators of such accommodations against an individual on the basis of disability. 42 U.S.C. § 12182(a). The act protects only those persons who can establish that they have a disability under the meaning of the statute. "To survive a defendant's summary judgment motion, an ADA plaintiff must meet the threshold burden of establishing that he is disabled under the statute." *Schluter v. Industrial Coils, Inc.,* 928 F.Supp. 1437, 1443 (W.D.Wis.1996) (citations omitted). Under the act, "disability" is defined as:

1. a physical or mental impairment that substantially limits one or more of the major life activities of an individual;
2. a record of such an impairment; or
3. being regarded as having such impairment.

42 U.S.C. § 12102(2). Section 504 of the Rehabilitation Act of 1974, 29 U.S.C.

706(8)(B), contains a materially identical definition of "handicapped individuals" and the two acts are generally treated by courts as synonymous. *See Crawford v. Indiana Dep't of Corrections,* 115 F.3d 481, 484 (7th Cir. 1997); *Stewart v. County of Brown,* 86 F.3d 107, 110 (7th Cir.1996). Plaintiff seeks to establish that L.W. is disabled under all three tests provided by the ADA.

Before addressing the merits of these arguments, it is worth noting that there is considerable support for the notion that HIV infection is a *per se* disability under the ADA and the Rehabilitation Act. *See, e.g., Gates v. Rowland,* 39 F.3d 1439, 1446 (9th Cir.1994) (person infected with HIV is disabled within meaning of Rehabilitation Act). Plaintiff is correct that the legislative history behind the ADA indicates that lawmakers understood that the act would cover anyone infected with HIV. *See, e.g.,* H.R.Rep. No. 101–485, pt. 2, 101st Cong.2d Sess. 31, 48 (1990), *reprinted in* 1990 U.S.C.C.A.N. 313, 330 (all persons with HIV are covered by ADA) (citing *Report of the Presidential Comm'n on the Human Immunodeficiency Virus* 123 (Jun.1988)). The floor statements, committee reports and other indicia of congressional intent have been adequately set forth in other cases and need not be recounted here. *See, e.g., Abbott v. Bragdon,* 107 F.3d 934, 942–943 (1st Cir.1997), *cert. granted,* —— U.S. ——, 118 S.Ct. 554, 139 L.Ed.2d 396 (1997); *Doe v. Kohn, Nast & Graf,* 862 F.Supp. 1310, 1320–1321 n. 7 (E.D.Pa.1994). Furthermore, plaintiff observes that before Congress passed the ADA, courts had held uniformly that individuals infected with HIV are disabled within the meaning of the Rehabilitation Act, *see Harris v. Thigpen,* 941 F.2d 1495, 1524–1525 n. 46 (11th Cir.1991) (collecting cases). Plaintiff then cites *Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), for the proposition that when "Congress adopts a new law incorporating sections of a prior law, Congress can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." In fact, numerous district courts have reached similar conclusions under the ADA. *See Hoepfl v. Barlow,* 906 F.Supp. 317, 319 n.

7 (E.D.Va.1995) ("It is now settled law that HIV-positive individuals are 'disabled' within the meaning of the ADA") (collecting cases). Pursuant to 42 U.S.C. § 12186(b), the Department of Justice has promulgated regulations interpreting Title III of the ADA. *See* 28 C.F.R. Pt. 36. A "rule of interpretation" provided in these regulations states that the act "shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act .... " 28 C.F.R. § 36.103.

██ Although persuasive, this evidence falls short of establishing that individuals infected with HIV automatically qualify as disabled under the ADA because it does not identify a major life activity or explain how that activity is substantially limited by HIV infection. Congress did not provide a list of physical and mental impairments that always qualify as disabilities. *See Homeyer v. Stanley Tulchin Assoc., Inc.,* 91 F.3d 959, 962 (7th Cir.1996) (disability determination "should not be based on abstract lists or categories of impairments, as there are varying degrees of impairments as well as varied individuals who suffer from the impairments"); *Byrne v. Board of Educ. School of West Allis–West,* 979 F.2d 560, 565 (7th Cir. 1992) (whether person qualifies as disabled under Rehabilitation Act is individualized inquiry). In other words, individuals are disabled under the ADA only to the extent that they can show that some condition satisfies one of the three statutory definitions of "disability." This fact has not escaped plaintiff or individuals infected with HIV who have brought suit under the ADA. Primarily, the debate has centered around the third element of the first test: whether procreation or reproduction is a "major life activity." This issue has divided three circuit courts of appeal, *see Abbott,* 107 F.3d at 939–943 (reproduction "and the bundle of activities that it encompasses" constitute major life activity), *Runnebaum v. NationsBank of Maryland, N.A.,* 123 F.3d 156, 170–72 (4th Cir. 1997) (en banc) (not major life activity), *Krauel v. Iowa Methodist Medical Center,* 95 F.3d 674, 677 (8th Cir.1996) (same), and is currently under consideration by the Supreme Court. Whether procreation is a major life activity will be addressed in the con-text of deciding whether L.W. is disabled within the meaning of the first test.

### A. Physical or Mental Impairment that Substantially Limits a Major Life Activity

To establish that L.W. is disabled under the first test, plaintiff must establish three things: 1) L.W. suffers from a physical or mental impairment 2) that substantially limits 3) a major life activity. 42 U.S.C. § 12102(2)(A).

### 1. Physical or mental impairment

██ HIV infection is a *per se* physical impairment within the meaning of the ADA. The regulations state specifically that the "phrase physical or mental impairment includes ... HIV disease (whether symptomatic or asymptomatic) .... " *Id.* Given that the disease destroys white blood cells even before an infected individual begins exhibiting outward symptoms, HIV qualifies as a physical impairment under the general definition of this term because it is a "physiological disorder or condition ... affecting ... [the] hemic and lymphatic" body systems. *Id.* To date, only one court has reached a different conclusion. *See Runnebaum,* 123 F.3d at 167–170. In doing so, the Court of Appeals for the Fourth Circuit failed to address in any way the act's administrative regulations, the degenerative effects of HIV or the uninterrupted line of cases in which HIV has been classified as a physical impairment. *See, e.g., Abbott,* 107 F.3d at 939 (citing *Gates,* 39 F.3d at 1445; *Doe v. Garrett,* 903 F.2d 1455, 1459 (11th Cir.1990)); *see also Leckelt v. Board of Commissioners of Hospital District No. 1,* 909 F.2d 820, 825 (5th Cir.1990); *Austin v. Pennsylvania Department of Corrections,* 876 F.Supp. 1437, 1465 (E.D.Pa.1995); *Doe v. Kohn, Nast & Graf,* 862 F.Supp. 1310, 1319–1320 (E.D.Pa.1994); *Doe v. District of Columbia,* 796 F.Supp. 559, 566 (D.D.C.1992); *Cain v. Hyatt,* 734 F.Supp. 671, 677–678 (E.D.Pa.1990); *Baxter v. City of Belleville,* 720 F.Supp. 720, 725 (S.D.Ill.1989).

Even if I could agree with the Fourth Circuit that "asymptomatic HIV will never

qualify as an impairment" because it "exhibits no diminishing effects on an individual," *Runnebaum*, 123 F.3d at 169, L.W. is not asymptomatic. Indeed, relying on the Centers for Disease Control chart, Dr. Gern has indicated that L.W. is moderately to severely symptomatic. L.W.'s T cell count has dropped well below that of an average child and, as a result, he spent four days in the hospital in order to be treated for a severe case of chicken pox. L.W. is physically impaired within the meaning of the ADA.

2. *Substantial limitation of major life activity*

■ "Major life activities" are not defined in the act, but regulations implemented by the Department of Justice explain that major life activities are "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 28 C.F.R. § 36.104. The statute and the regulations offer no guidance regarding the definition of "substantially limited." In the appendix to the regulations, the Department of Justice explains that an impairment is substantially limiting when an "individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R. Pt. 36, App. B, at 610. As already indicated, plaintiff has framed the question as whether procreation or reproduction may fit within the illustrative examples provided in this list. The parties address this issue as two discrete inquiries: 1) whether procreation is a major life activity; and, if so, 2) whether HIV has substantially limited L.W.'s ability to procreate. However, the Seventh Circuit has observed that in some cases "substantially limited" and "major life activity" are interrelated and should not be treated as two separate criteria, particularly when the major life activity implicated encompasses a broad range of lesser activities, such as learning or working. *See Knapp v. Northwestern Univ.*, 101 F.3d 473, 479–480 (7th Cir.1996) (Rehabilitation Act). As explained by the court:

> major life activities are defined in a more individualized manner during the "substantial limitation" analysis, where ... we

look at whether the particular impairment constitutes a significant barrier for [a] particular person. What impairment will significantly impede learning for a person obtaining her third doctorate is not the same as one which would affect the average tenth grader's ability to learn. But any narrowing of what constitutes learning for a particular individual occurs within reasonable limits—coverage of the Rehabilitation Act is not open ended or based on every dream or desire that person may have. Not every impairment that affects an individual's major life activities is a substantially limiting impairment.

*Knapp*, 101 F.3d at 481 (citation omitted). This caveat is particularly apt when the activity is procreation and the individual is a three-year old child. Plaintiff emphasizes that a person need not prove that she has any interest or intent to engage in a specific major life activity in order to satisfy this part of the statutory definition of disability. *See Runnebaum*, 123 F.3d at 170 (under substantial limitation test, question is not whether particular activity is important to particular individual) (citing *Abbott*, 107 F.3d at 941). Nevertheless, there is something inherently illogical about inquiring whether an individual's ability to perform a particular activity is substantially limited by an external factor when, for entirely unrelated reasons, this individual is incapable of engaging in that activity in the first place. Arguing that HIV substantially limits the ability of L.W. to procreate makes as much sense as asserting that the disease restricts his major life activity of working. Although there is some merit to both of these claims in the sense that L.W.'s *potential* to work and procreate is substantially limited, adopting plaintiff's interpretation of this part of the statutory definition of disability would be inconsistent with the individualized approach imposed by the court of appeals. The correct and more logical application is to start by identifying those activities that are important in the life of three-year old. Procreation does not make this list. Thus, there is no need to determine whether procreation is a major life activity within the meaning of the ADA.

This conclusion notwithstanding, plaintiff contends in the alternative that HIV has substantially limited L.W.'s ability to care for himself as well as his ability to engage in three other novel major life activities: living, growing and socializing. Although the demands of treating L.W.'s condition undoubtedly make it more difficult for his aunt to care for him, the same cannot be said for L.W., who, like most children, is not expected to schedule doctor's appointments or manage the complex logistics of his daily pill regimen. The undisputed facts establish that L.W. is able to care for himself in all of the obvious ways expected of a healthy three-year, such as dressing and feeding himself. There is no indication that he needs special assistance performing manual tasks, walking or communicating. However, L.W. was hospitalized for a severe case of chickenpox at a time when his T cell count was dangerously low. Regardless of age, individuals with suppressed immune systems who are vulnerable to opportunistic infections are limited to some extent in their ability to care for themselves. Certainly, caring for oneself includes the body's ability to fight off common, relatively mild infectious agents without the need of serious medical intervention. Thus far, L.W. is fortunate enough to have experienced no subsequent opportunistic infections or hospitalizations and his T cell count is stable. These encouraging developments do not necessarily mean that L.W. can care for himself without substantial limitations. This court has noted that

> many diseases, such as the AIDS virus, may create intermittent problems that might not be considered a disability under the act if viewed in isolation, but would show a substantial limitation of a major life activity if viewed over an extended period of time. Put another way ... when an impairment creates smaller intermittent impairments, the disability focus should be on the effects of the overall impairment. Such a focus allows the court to expand the scope of the disability inquiry, which is appropriate in a situation in which the overall disability creates sporadic impairments that may create a substantial limitation when viewed cumulatively.

*Schluter,* 928 F.Supp. at 1446 (citing *Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir.1995)). Plaintiff is correct that this question should be resolved without reference to the alphabet soup of medication responsible for stabilizing L.W.'s T cell count. The Department of Justice's recommendation to make the substantial limitation assessment "without regard to the availability of mitigating measures ... even if the effects of the impairment are controlled by medication" should be heeded in the case of HIV. 28 C.F.R. Pt. 36, App. B, at 611. In a previous ADA case, I disregarded identical language in the appendix to the regulations for Title I of the ADA:

> If an insulin-dependent diabetic can control her condition with the use of insulin or a near-sighted person can correct her vision with eyeglasses or contact lenses, she cannot argue that her life is substantially limited by her condition. To say that a person who needs insulin or eyeglasses is disabled in fact is to read out of the act's first definition of disability the requirement that it applies only to those persons who are "substantially limited" in major life activities.

*Schluter,* 928 F.Supp. at 1445. Unlike diabetes and insulin, the medication available to L.W. and others infected by HIV has no proven long term effectiveness and may become useless if a resistant form of the virus develops. Though stabilized, L.W.'s immune system is still moderately suppressed. Viewed in isolation, L.W.'s hospital stay does not indicate that his HIV infection substantially limits his ability to care for himself. However, when viewed in conjunction with L.W.'s persistent vulnerability to other opportunistic infections and his current diagnosis as moderately to severely symptomatic, an inference could be drawn that HIV has substantially limited his ability to care for himself.

■ Plaintiff's remaining arguments are less persuasive. To the extent that growing and socializing are major life activities, L.W. is experiencing no problems interacting with his peers and his height, while significantly below average, is increasing at a rate parallel to that of his peers. Finally, living is not a

major life activity within the meaning of the ADA. Notwithstanding the tautological nature of this proposition, adopting such an expansive construction of "major life activity" without any textual or judicial support would be unwise and would likely yield bizarre and unintended results not far down the road. For example, under plaintiff's approach, one could argue that a heavy smoker at high risk for lung cancer or heart disease with an expected life-span of only ten more years is substantially limited in her major life activity of living, even if the smoker exhibits no medical or physical problems at the time.

### B. *Record of Impairment*

■ Under the second statutory test for determining who is disabled under the ADA, an individual must establish that she has a record of an impairment that substantially limits one or more of her major life activities. 42 U.S.C. § 12102(2)(B). L.W.'s hospitalization for chicken pox is sufficient to establish a record of impairment that substantially limited his ability to care for himself. *See School Bd. of Nassau v. Arline*, 480 U.S. 273, 281, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (hospitalization for acute form of tuberculosis that affected respiratory system and two recurrences twenty years later that did not require hospital stay constitute record of impairment under Rehabilitation Act). However, because there is no indication that defendants were aware of these events, L.W. was not disabled within the meaning of 42 U.S.C. § 12102(2)(B).

### C. *Regarded As Disabled*

The regulations state that an individual is regarded as having an impairment that substantially limits a major life activity within the meaning of 42 U.S.C. § 12102(2)(C) when that individual:

1. Has a *physical or mental impairment* that does not substantially limit major life activities but that is treated by a private entity as constituting such a limitation;

2. Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

3. Has none of the impairments defined in paragraph (1) of this definition but is treated by a private entity as having such an impairment.

28 C.F.R. § 36.104. In the appendix to these regulations, the Department of Justice explains that "[t]he perception of the private entity or public accommodation is a key element of this test.... A person would be covered under this test if a restaurant refused to serve that person because of a fear of 'negative reactions' of others to that person." 28 C.F.R. Pt. 36, App. B, at 612. In addition, this appendix credits the Supreme Court's decision in *Arline* as the impetus behind the third "regarded as" test. *Arline*, 480 U.S. at 276, 107 S.Ct. 1123, involved a school teacher who sued her former employer under the Rehabilitation Act after being discharged for having an active case of tuberculosis. The school board acknowledged that Arline had a physical impairment but argued that it did not fire her "because of her diminished physical capabilities, but because of the threat that her relapses of tuberculosis posed to the health of others." *Id.* at 281, 107 S.Ct. 1123. Responding to this argument, the Court disagreed that

the contagious effects of a disease can be meaningfully distinguished from the disease's physical effect on a claimant in a case such as this. Arline's contagiousness and her physical impairment each resulted from the same underlying condition, tuberculosis. It would be unfair to allow an employer to seize upon the distinction between the effects of disease on others and the effects of a disease on a patient and use that distinction to justify discriminatory treatment.

\* \* \* \* \* \*

Allowing discrimination based on the contagious effects of a physical impairment could be inconsistent with the basic purpose of § 504, which is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others. By amending the definition of "handicapped individual" to include not only those who are actually physically impaired, but also those who are regarded as

impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment.

*Id.* at 282 and 284, 107 S.Ct. 1123. As these passages suggest, the purpose of the "regarded as" test is similar to that of Title VII of the Civil Rights of Act of 1964: to root out invidious forms of discrimination. *See Vande Zande,* 44 F.3d at 541 ("regarded as" test fits with act's preamble, comparing people shunned as a result of physical or mental impairment to victims of racial discrimination). The Department of Justice has adopted a similar interpretation of the ADA, concluding that "a person not allowed into a public accommodation because of the myths, fears and stereotypes associated with disabilities would be covered under this third test whether or not the person's physical or mental condition would be considered a disability under the first or second test in the definition." 28 C.F.R. Pt. 36, App. B, at 612.

■ Defendants are correct that liability under the "regarded as" test may not be premised solely on their knowledge of L.W.'s HIV status. Knowledge alone says nothing about how a covered entity perceived an individual infected with HIV. Here, however, plaintiff has adduced sufficient evidence to permit the drawing of an inference that defendants regarded L.W. as having a disability. In particular, a jury could find that defendants excluded L.W. from their programs because they feared that employees and the parents of other children would react negatively to the presence of an HIV-positive child. Plaintiff alleges that the day McNuckle dropped off L.W.'s medical form she received a message from an employee of defendant Kiddie Ranch informing her that L.W.'s spot had been filled by mistake. Pl.'s Prop. Findings of Fact (Dkt.# 51) at ¶ 73. Although defendant Kiddie Ranch maintains that the purpose of this phone call was to inform McNuckle of additional registration requirements, I must accept plaintiff's version of the conversation as true for the purpose of this motion. On March 4, an employee of defendant Kiddie Ranch told L.W.'s social worker

that there was an opening for a three-year old, contradicting the message conveyed to McNuckle three days earlier. With respect to defendant ABC Nursery, the undisputed facts establish that the day McNuckle told an employee of L.W.'s HIV infection, she received a phone call informing her that no openings existed. However, plaintiff alleges that in an earlier conversation, an employee of defendant ABC Nursery not only told McNuckle that openings existed but set a specific starting date. *Id.* at ¶ 81. Furthermore, plaintiff contends that the person in charge of enrollment for defendant ABC, Bonnie Schill, told another employee that she had enrolled an HIV-positive child, that she had to get out of it, and that she could do so and avoid being charged with discrimination by not enrolling any other children for the next two or three weeks. *Id.* at ¶¶ 84–85. Finally, plaintiff alleges that the owner of defendant Happy Time, Eula Buchanan, told the Rock County Human Services official that she was having second thoughts about admitting L.W., that staff had threatened to quit if she allowed him to enroll and that parents might withdraw their children if they discovered that there was an HIV-positive child in the program. *Id.* at ¶¶ 97 and 99. The following day, plaintiff contends, Buchanan called McNuckle to say that she would not accept L.W. because two of her staff members had threatened to quit if she did so. *Id.* at 101. Although disputed, these factual allegations are deemed true on a motion for summary judgment. With respect to defendant Happy Time, it is worth noting that McNuckle's deposition account of the telephone conversation with Buchanan is consistent with the version she relayed to Casiday later that day. The common theme that emerges from these allegations is that the decisions made by each defendant with respect to L.W. were driven by society's myths and fears about the contagious nature of HIV and AIDS.

Defendants maintain that plaintiff has failed to establish that L.W. is disabled under the "regarded as" test because there is no indication that they believed his HIV infection substantially limited a major life activity. This argument is premised on the reasonable

possibility that "regarded as having such an impairment," 42 U.S.C. § 12102(2)(C), means an impairment that substantially limits a major life activity. Two courts have adopted this construction of the statute in the context of HIV infection. *See Runnebaum,* 123 F.3d at 172–174 (no evidence that relevant decision maker regarded plaintiff as having an impairment that substantially limited major life activity); *Cortes v. McDonald's Corp.,* 955 F.Supp. 541, 546 (E.D.N.C.1996) (same). As already indicated, the Department of Justice has taken a divergent position in its analysis of the regulations it promulgated pursuant to Title III of the ADA:

> If a person is refused admittance on the basis of an actual or perceived physical or mental condition, and the public accommodation can articulate no legitimate reason for the refusal ... a perceived concern about admitting persons with disabilities could be inferred and the individual would qualify for coverage under the "regarded as" test.

28 C.F.R. Pt. 36, App. B, at 612. As a general matter, administrative interpretations of regulations and corresponding statutes are entitled to "considerable deference," *see Bedford Medical Center v. Heckler,* 766 F.2d 321, 323 (7th Cir.1985), so long as the plain meaning of a statute or regulation does not rule out the interpretation expressed by the agency. *See Community Hospital of Indianapolis v. Schweiker,* 717 F.2d 372, 375 (7th Cir.1983); *Schluter,* 928 F.Supp. at 1445. Defendants' argument might carry greater force were it not for *Arline.* Requiring plaintiff to show that defendants believed L.W.'s HIV status substantially limited one of his major life activities, such as learning or caring for himself, would undermine the Supreme Court's declaration that no meaningful distinction should be drawn between the myths, fears and ignorance surrounding contagious diseases and the actual effects such stigmatizing conditions have on individuals who suffer from them. *See Arline,* 480 U.S. at 273, 107 S.Ct. 1123 (impairment that might not diminish person's physical or mental capabilities "could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment"). Thus, the relevant inquiry is whether the allegedly prejudicial reactions of defendants substantially limited one of L.W.'s major life activities. Just as the negative reaction of an employer to a contagious disease can substantially limit an individual's ability to work, the ability of L.W. to learn has been substantially limited because defendants' misapprehensions and fears have prevented him from enrolling in day care.

### ORDER

IT IS ORDERED that the motion of defendants Happy Time Day Care Center, Kiddie Ranch and ABC Nursery, Inc. for summary judgment is DENIED because plaintiff United States of America has established that there is a genuine dispute whether L.W. is disabled within the meaning of the Americans with Disabilities Act.